WILLIAMS, J.
h The defendants, Windrush Operating Company, Thomas Gaylord, Mecom Oil, and John Mecom, III, appeal a judgment ordering the rescission of an amendment of an oil and gas lease on the ground of fraud, resulting in cancellation of the lease. Concluding that the trial court was clearly wrong in finding the existence of fraud, we reverse.
FACTS
Harry Scott Henderson (“Henderson”) is a former chief of the Bossier City Police Department. After retiring, he and his wife, Sherry, have raised cattle and horses on their land in south Bossier Parish. Through the years, the couple acquired tracts of land totaling approximately 700 acres, located in Sections 28, 32, and 33 in Township 17 North, Range 12 West. The record indicates that these tracts were contiguous, with the largest part of the property in Section 33.
On February 28, 2005, the Hendersons granted a mineral lease to Windrush Operating Company (“Windrush”), which was owned by Dicky Dardeau and Thomas Gaylord. Henderson testified that he signed the lease without reading it, then read it sometime later. The lease provided for a primary term of three years for a $150 per acre bonus, with a 3/16 royalty. The lease included a typical habendum clause, provisions relative to continuous operations at the end of the primary term, and a Pugh clause.[1] A memorandum of the lease was filed in the Bossier Parish conveyance records in November 2005.
| gGaylord and Dardeau presented themselves to Henderson as experienced oil and gas professionals. They told Henderson they would drill as many wells in the Cotton Valley formation on his property as law and spacing would allow. Dardeau and Gaylord visited Henderson numerous times and occasionally used his home as an office. Dardeau, Gaylord, and Henderson spent much time together drinking coffee, eating breakfast and lunch, or sitting in their pickup trucks talking.
Gaylord discussed Henderson’s family, cattle business, and finances with him. He advised Henderson to develop a business plan for his ranch. Gaylord suggested a meeting with his financial planners in *286 Houston so Henderson could learn how to best manage the money he would make when his wells began producing.
The Hendersons visited Gaylord and his wife in Houston in February 2007 to attend the Houston Livestock Show. No business was transacted during this social visit. Around this time, Gaylord introduced Henderson to John Mecom, III (“Mecom”), who was described as an “investor.” Mecom told Henderson that his family had been in the oil and gas business all of his life, that his father had once owned the New Orleans Saints and that he planned to drill a lot of Cotton Valley wells in Bossier Parish. During 2007, Mecom visited Henderson’s ranch. The men often talked about cattle, horses, family, and other matters not related to the lease. Mecom also spoke with Henderson about plans for his property.
In July 2006, Windrush assigned the lease to Global Explorer. Then, on February 23, 2007, Global assigned the Henderson lease to Mecom Oil [sNorth Louisiana, LP; Mecom Oil, LLC; Texas Ranger, Inc.; and Shyla Corporation (hereinafter collectively the “Mecom Group”). Henderson was unaware of the assignments to Global and the Mecom Group. In December 2007, Windrush assigned its overriding royalty interest to Carlo Roppollo, John Hyatt, C.D. Dickey Dardeau, Donna Dardeau, Thomas Gay-lord, and Linda Gaylord.
The Henderson No. 1 well was permitted and spudded in February 2007. This well was drilled in the middle of Section 33. According to information filed with the Office of Conservation, the state potential had not been performed until March 1, 2008. The state reports showed very little production. The Henderson No. 2 well
Henderson spoke to several neighboring landowners on behalf of Gaylord and Me-com regarding the lease of their mineral rights because he wanted to help the two men. Gaylord identified the neighbors that he wanted Henderson to contact. Henderson told those neighbors that he had leased his minerals to Gaylord and Mecom, whom he liked and trusted. Henderson thought that many of his neighbors signed mineral leases with Gay-lord and Mecom. Henderson also helped Gaylord obtain pipeline rights-of-way. Henderson did not expect any compensation for his work.
|4The first lease that Gaylord obtained from a neighbor involved the effort of Henderson to find the owner of the minerals in West Texas. Gaylord gave an overriding royalty from the lease to Henderson’s children in recognition of his help. Henderson began accompanying Gaylord to the Bossier Parish courthouse to examine property records. Henderson later searched the records on his own at Gaylord’s request. Henderson testified that he felt that Gaylord was his friend and that Gaylord trusted him.
Mecom, Gaylord, Dardeau, and Henderson talked in the fall of 2007 about starting a saltwater disposal company. A CPA was consulted and each person was asked to pay $1,000 to cover the cost of work that had been done in the initial *287 planning for the company. The four men eventually decided not to pursue this venture because of the number of trucks that would be driving on Henderson’s property, the cost of obtaining additional land and the uncertainty of obtaining the necessary permits.
A third well site was started on Section 33, but Mecom became discouraged with its prospects and decided not to drill on the site. At this third well site, a road was built, a pad was started, a pit was dug, and cattle gaps were installed. Henderson believed work was last done on the third well site in September or October of 2007. In any event, the third well was never spud-ded or drilled in Section 33.
In December 2007, Mecom gave Henderson a check for $10,000 as a gift. Mecom gave such large gifts to only two other individuals at the time. Mecom testified that he thought giving Henderson $10,000 was the right thing to do. The note that accompanied the check read, “Thank you for all kyour help and patience. This year has not been an easy one for all of us up there. I truly appreciate your trust and enjoy our friendship.” Mecom also wrote “Merry Christmas” on the note. He denied that he was hoping to win Henderson’s trust and friendship with the gift, or that the check had anything to do with obtaining a lease extension. Henderson did not think of the check as compensation; he thought of it as a gift from a friend. This gift occurred about six weeks before Henderson granted the lease extension that is the subject of this lawsuit.
Crews were on the lease in February of 2008 moving a pump from the No. 2 well to the No. 1 well in the hope of pumping off water that was thought to be suppressing the gas volume. The intention was to increase the low gas production, but the effort failed.
The three-year primary term of the Henderson lease was set to expire on February 28, 2008. Earlier that month, Henderson spoke by phone with Gaylord, who said that he and Mecom were coming to Bossier City and wanted to meet Henderson at a local casino restaurant to discuss a lease extension. Henderson stated that the terms and details of the lease extension were not discussed during the call, and that he had not agreed to the extension then or at any time before the meeting.
Following the phone call from Gaylord, Henderson spoke with Larry Scott, who has been Henderson’s close friend for 50 years. Scott had been involved in a prior oilfield deal that did not work out in his favor. Henderson told Scott that he was going to a meeting to discuss extending the lease, but that he had not made up his mind because of the lack of ^production from the existing wells. Scott said he wanted to go to the meeting, but Henderson told him that he was not invited. Nevertheless, Scott went to the casino restaurant and sat at an adjacent table to eavesdrop on his friend’s conversation with Mecom and Gaylord.
At the parties’ meeting on February 5, 2008, Henderson was asked about extending the lease. When he said that he had not made up his mind, Mecom responded that he had spent a lot of money on the lease and wanted an extension. Henderson recalled that when he again expressed uncertainty, Mecom told him that he could extend the lease for two years without his consent because of a clause in the lease. Henderson then asked Gaylord if this was true and Gaylord confirmed that the lease could be maintained in effect without Henderson’s consent.
Henderson was told that Gaylord and Mecom wanted to continue operations on *288 his land by drilling wells closer to a fault line. As payment for the two-year extension, he was offered a bonus of $90 per acre, or approximately $70,000, plus an increase to a 20% royalty position. When Henderson asked Mecom why he would be paid to extend the lease since it could be done without him, Mecom told him that it was the right thing to do, as they had been through a lot together and they would rather do it that way. After Mecom left the table to go to the restroom, Gaylord counseled Henderson to accept the “free money.”
Henderson testified that he agreed to the lease extension at that meeting. However, he asked for the removal of the two-year provision that |7Gaylord and Mecom told him could be used to extend the lease. Gaylord and Mecom agreed to its removal.
In his testimony, Mecom explained that he sought the extension because he felt the two Henderson wells had not sufficiently condemned the acreage as unproductive. Additionally, Mecom had already made a significant financial investment in the acreage and did not want to walk away at that time. He believed that paying Henderson to extend the lease made the most sense, because the only other option to extend the lease was to try to meet the continuous operations provision of the lease.
It is undisputed that neither a copy of the original lease nor the proposed written extension was available for the parties’ review at the dinner meeting. Betty Hirsch, Windrush’s landman, first brought the lease amendment for the extension to Henderson’s home a few days after the meeting. Two days later, she returned to pick up the signed lease extension.
The “Lease Amendment” was executed by the Hendersons on February 11, 2008, identifying the Windrush lease and providing in pertinent part:
WHEREAS, the Lease has since been assigned to Mecom Oil, LLC, et al (“Me-com”) and will, in the absence of production or continuous drilling operations as more specifically provided for in the Lease, expire on February 28, 2008, and now Lessor and Mecom desire to further amend the Lease.
NOW, THEREFORE, Lessor, for and in consideration of the sum of Ten Dollars ($10.00) cash in hand paid, the receipt and sufficiency of which is hereby acknowledged, does hereby agree to make certain additional changes and amendments to the Lease as hereinafter set forth:
ls(l) Extend the primary term of the Lease for an additional two (2) years until February 28, 2010, without further requirement for any rentals or lease payments; and
(2) Increase the rate of royalty from 18.75% to 20% effective as of February 28, 2008; and
(3) Add the following provision as Paragraph K to the rider attached as Exhibit “B” to the Lease:
“Lessee is hereby given the option to exten[d] the primary term of the Lease covering all or any portion of the Leased Premises for an additional period of two (2) years from expiration of the extended primary term on February 28, 2010. If such option is exercised, the primary term of the Lease shall then be extended until February 28, 2012. As consideration of the grant of such option, Lessee, on or before February 28, 2010, shall send to Lessor a check calculated by multiplying the acres selected by Lessee for extension times a bonus consideration of $200.00 per net mineral acre. Failure to exercise such option on or before February 28, 2010, or make the payment of bonus consider *289 ation as hereinabove provided, shall result in the termination of the Lease as to all lands, dept[hs a]nd forma-, tions not theretofore included within a producing unit as more fully specifically provided for in the Lease as amended hereby.”
(4) Eliminate the words “Two (2) years” immediately preceding the word “after” found in the third sentence of the provision identified as paragraph B to the rider and capitalize the word “After.”
EXCEPT as above amended, the Lease shall remain as originally written. However, in the event of a conflict between the terms and provisions of this Lease Amendment and the Lease, the terms of the Lease Amendment shall prevail.
A memorandum of the oil and gas lease extension was filed in Bossier Parish’s conveyance records, noting only that the primary term of the lease was extended until February 28, 2010.
In late March 2008, there was an article in The (Shreveport) Times concerning the economic development potential of the Haynesville Shale. After reading this news, Henderson was excited and contacted Mecom with ] 9an offer to send him the article. Mecom declined and did not seem as interested in the news as Henderson expected, giving him the impression that Mecom may have already heard about the Haynesville Shale.
In April 2008, Mecom signed an agreement with Lantana Oil and Gas Partners to represent the Mecom Group in divesting certain leasehold rights located in the Elm Grove Field in Bossier Parish. Lantana was the company of David Nini, who was Mecom’s friend. Nini then sent an email to Stephen Herod, Executive Vice-President of Petrohawk, advising that his client held leases covering 3,000 contiguous acres in Bossier’s Sligo Elm Grove area and was aware of the large payments being paid for mineral acreage with Haynesville Shale potential. Subsequently, Mecom accepted Petrohawk’s offer of $6,750 per acre to purchase the Mecom Group’s leases in the Elm Grove Field.
In May 2008, the Mecom Group conveyed its leasehold interests in 2,516 net mineral acres to Petrohawk for the price of $16,982,673. The tract included the 678.60 net mineral acres on Henderson’s land. Later that month, Hirsch visited Henderson to obtain his written consent for the assignment of the lease to Petro-hawk, but Henderson refused. Henderson was disappointed in Gaylord and Mecom because the lease was conveyed to Petro-hawk after they told him their plan was to drill more Cotton Valley wells and they had never mentioned selling the lease. For the first time, Henderson suspected that Gaylord and Mecom had been untruthful.
In June 2008, Mecom flew to Shreveport and met Henderson at the ranch. Mecom apologized for the way that Henderson had found out about [ inthe lease assignment to Petrohawk and said that Gaylord was supposed to tell him in person. Mecom explained that the assignment was just a business deal that gave him the chance to make money. He asked for Henderson’s written consent to the Petrohawk assignment. Henderson again refused.
During this meeting, Mecom offered to pay off the ranch’s mortgage, which was about $250,000. When Henderson asked Mecom why he was offering to do it, Me-com replied that he had made some money and thought it was the right thing to do. Henderson eventually accepted the offer because there were no conditions placed upon him for receiving that benefit. Gay-lord and Dardeau had encouraged Mecom to pay off the mortgage because the money was an unexpected windfall and *290 Henderson’s ranch would then be debt free in the event that Petrohawk drilled dry holes.
In August 2008, the plaintiffs, Harry and Sherry Henderson, filed suit against the defendants, Windrush, Gaylord, Mecom Oil, Mecom, and Hyatt, alleging that Gay-lord and Mecom had misrepresented that the language of the 2005 lease gave them the right to extend the lease without the lessor’s consent, that they failed to reveal their true reason for seeking the extension and that the plaintiffs would not have agreed to the lease amendment for such a low bonus absent the defendants’ fraud. The Hendersons sought damages, attorney fees, the rescission of the lease amendment, a declaration that the 2005 mineral lease expired by its own terms at the end of the primary term on February 28, 2008, and the restoration of their mineral rights that would have accrued to them upon expiration of the primary term.
|1TOn September 22, 2009, Petrohawk signed a top lease with the Hendersons that covered 660 acres. The lease, which called for a bonus payment of $6,900 per net mineral acre, would not become effective until the Windrush lease was terminated by final judgment or compromise agreement. In December 2009, Petro-hawk received a permit to drill a Haynes-ville Shale well on the subject property. Two successful wells have actually been drilled by Petrohawk, for which the Hendersons have received royalties of nearly $1,500,000.
Prior to trial, the district court denied the defendants’ exception of nonjoinder of a necessary party and Petrohawk’s petition for intervention. Following a bench trial, the court issued a written opinion finding that the defendants actively misrepresented the purpose of the Pugh clause, that all of the circumstances surrounding the transaction showed the defendants’ intent to obtain an unjust advantage by getting the lease extension and that the misrepresentation about the Pugh clause was the only reason that Henderson consented to the lease extension. The court further found that even though Henderson could have obtained the truth about the lease without difficulty or special skill by reading the lease and the proposed amendment, plaintiffs could assert their fraud claim because a relation of confidence existed between the parties.
Further, the court considered Mecom and Gaylord to be untrustworthy witnesses and was not persuaded by their argument that the lease could have been extended through continuous operations. In making the finding of fraud, the trial court noted the testimony of the Hendersons’ | ^expert that Haynesville Shale wells were being produced in 2006 and that reports on the shale were being circulated prior to February 2008.
On December 9, 2011, the trial court rendered judgment providing that: (i) the February 2008 lease amendment was rescinded for fraud and was to be removed from the conveyance records; (ii) the February 2005 lease expired by its own terms at the end of the three-year primary term; and (iii) defendants were to pay $16,152.50 in expert witness fees, $22,120.30 in costs, and $1,612,830 in attorney fees. The defendants and Petrohawk appeal the judgment.[3]
DISCUSSION
The defendants contend the trial court was clearly wrong in finding that they committed fraud against the Hendersons. Defendants argue that they did not misre *291 present their rights as lessees because under the continuous operations clause they could extend the lease beyond the primary term without the Hendersons’ consent.
A contract is formed by the consent of the parties established through offer and acceptance. LSA-C.C. art.1927. Contracts have the effect of law for the parties and must be performed in good faith. LSA-C.C. art.1983. Each provision of a contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole. LSA-C.C. art.2050.
Consent to a contract may be vitiated by fraud. LSA-C.C. art.1948. Fraud is a misrepresentation or a suppression of the truth made with the 11sintention either to obtain an unjust advantage for one party or to cause a loss or inconvenience to the other. Fraud may also result from silence or inaction. LSA-C.C. art.1953.
The three basic elements to an action for fraud against a party to a contract are: (1) a misrepresentation, suppression, or omission of true information; (2) the intent to obtain an unjust advantage or to cause damage or inconvenience to another; and (3) the error induced by a fraudulent act must relate to a circumstance substantially influencing the victim’s consent to (a cause of) the contract. Shelton v. Standard/700 Associates, 2001-0587 (La.10/16/01), 798 So.2d 60. Fraud must be proven by a preponderance of the evidence. LSA-C.C. art.1957.
Fraud does not vitiate consent when the party against whom the fraud was directed could have ascertained the truth without difficulty, inconvenience, or special skill. However, this exception is not applicable when a relation of confidence has reasonably induced a party to rely on the other’s assertions or representations. LSA-C.C. art.1954.
An appellate court may not set aside a trial court’s finding of fact in the absence of manifest error or unless it is clearly wrong. Cole v. State Dept, of Public Safety & Corrections, 2001-2123 (La.9/4/02), 825 So.2d 1134; Stobart v. State Dept, of Transp. and Development, 617 So.2d 880 (La.1993). A district court’s findings of fact with respect to a claim of fraud are subject to the manifest error rule. Ballard’s Inc. v. North American Land Development Corp., 28,437 (La. App.2d Cir.6/26/96), 677 So.2d 648. To reverse a fact finder’s determination, the appellate court must 114find from the record that a reasonable factual basis does not exist for the finding of the trial court and that the record establishes that the finding is clearly wrong. Stobart, supra.
In the present case, we must consider the written provisions of the lease to assess whether the defendants misrepresented their right to extend the lease beyond the primary term without the Hendersons’ consent. We note that the original lease contains a provision known as a “continuous operations” clause in paragraph six (6) that provides in relevant part:
If at the expiration of the primary term or at the expiration of the ninety (90) day period provided for in the preceding sentence, oil, gas, sulphur or other mineral is not being produced on said land or on land pooled therewith, but Lessee is then engaged in operations for drilling, completion or reworking thereon, or operations to achieve or restore production, or if production previously secured should cease from any cause after the expiration of the primary term, this lease shall remain in force so long thereafter as Lessee either (a) is engaged in operations for drilling, completion or reworking, or operations to achieve or restore production, with no *292 cessation between operations or between such cessation of production and additional operations of more than ninety (90) consecutive days[.]
Thus, the lease expressly provides a method for the lessees to extend the lease beyond the primary term without additional approval of the lessor, as asserted by the defendants. The clause states that the lease shall remain in effect after expiration of the primary term so long as the lessees are engaged in drilling or reworking operations on the leased premises.
Concerning the concept of the primary term, Henderson testified that he understood the three-year primary term of the lease, which he signed in 2005, to mean that the running of that time period might cause the lease to end. .Henderson’s description of the allegedly fraudulent misrepresentation 11Bwas not that he was told his lease was actually for a five-year term, but that Mecom as lessee could extend the lease beyond February 28, 2008, without Henderson’s agreement.
At trial, Henderson was shown the continuous operations clause, which is contained in the lease that he negotiated in 2005, and acknowledged that the language “seems to say” that certain operations would extend the lease beyond the primary term. Moreover, the continuous operations clause was discussed at the parties’ restaurant meeting, as admitted by Henderson, who testified that Gaylord had talked about operations that could extend the lease beyond the primary term. On cross-examination, Henderson described the exchange as follows:
Q. Did he also talk about operations that were — that could be conducted to extend the lease?
A. I think Mr. Gaylord did.
Q. And what did he say about that?
A. Pretty similar to what he testified to yesterday but I don’t understand — I don’t understand that.
Q. So you heard him testify yesterday and you heard him testify that he — that they could have conducted operations to extend the lease beyond its primary term. And that’s what he said to you at the Binion’s meeting, right?
A. Similar to that.
Ignoring the continuous operations provision, the trial court determined that the defendants had misrepresented the Pugh clause of the lease by telling Henderson that they, as lessees, could extend the lease for two years beyond February 28, 2008, even if Henderson did not consent to an extension. The Pugh clause provides in pertinent part:
Anything in the lease to the contrary notwithstanding, operations on, or production from, any unit or units (formed by Lessee’s declaration, private agreement, state or other governmental authority, or otherwise) embracing both land | therein leased and other land, shall maintain the lease in force only as to that portion of Lessor’s land included in such unit or units, whether or not said drilling or production is on or from the leased premises.... Two (2) years after expiration of the primary term, unit operations or production shall maintain the lease only within the geographical boundaries of such unit or units and only as to all formations from the surface of the ground down to the stratigraphic equivalent of the deepest depth drilled and logged by Lessee in said unit well, and the lease, as to all areas outside of the geographical boundaries of and as to all lower formations within such unit or units shall ipso facto cease, terminate and be forfeited without notice, demand or putting in default, provided, however, that if the said unit well *293 is drilling at the expiration of the primary term, such drilling operations shall continue the lease within the geographical boundaries of the said unit or units in full force and effect as to all depths until such drilling and logging operations are concluded, at which time the lease shall ipso facto cease, terminate and be forfeited without notice, demand or putting in default as to all formations below the stratigraphic equivalent of the deepest depth drilled and logged in said unit well.
(Emphasis supplied.)
In its written opinion, the trial court quoted a portion of the Pugh clause and concluded that “[n]owhere in this clause does it authorize an extension of the lease term without the [lessor’s] consent.” However, the Pugh clause cannot be read in isolation, but must be read in light of the continuing operations clause in paragraph (6). Reading these lease provisions together demonstrates that the trial court’s conclusion about the Pugh clause is incorrect. Contrary to the court’s determination, the Pugh clause, along with paragraph (6), does address the lessee’s right to extend and maintain the lease as to all or part of the lease acreage when engaged in continuous operations at the end of the primary term. Under these lease provisions and without misrepresenting the truth, Mecom could assert his |17rights to continue operations regarding the two existing wells or to commence another well in seeking the extension from Henderson.
Although the trial court found that there was a close friendship between Henderson, Gaylord and Mecom, such a relationship did not require the lessees to give up their rights under the lease. Despite such a friendship, Henderson was aware that he was also in an onerous contractual relationship with Mecom concerning the use of Henderson’s property for oil and gas operations. A contract is onerous when each of the parties obtains an advantage in exchange for his obligation. LSA-C.C. art. 1909.
Pursuant to the original lease, which Henderson signed in 2005 before meeting Mecom, upon the expiration of the three-year primary term, the lessee has the right through the habendum clause to continue the lease for “as long thereafter” as oil or gas is produced or the lease “is maintained in force in any other manner herein provided.” As stated above, another method .of maintaining the lease is provided in paragraph (6), which expressly allows the lessee to extend the lease beyond the primary term by engaging in continuous operations, such as drilling or reworking- activity. The Pugh clause is applicable 'during this extended term to limit the effect of the lessee’s well operations to those leased areas included in the unit for such well and to certain depths.
Based upon the lease language, and with two unplugged wells on the leased premises in February 2008, Mecom could truthfully assert his rights to maintain the lease in effect beyond February 28, 2008, through continuing operations. Additionally, the evidence shows that such | ^operations were possible. Operations to enable production for the Henderson No. 1 well were performed in February 2008 and in the same month the record of this well as reported to the Office of Conservation showed that the well was still awaiting its initial state potential testing. Mecom asserted that an attempt to recomplete the well in the Hosston formation before its total abandonment was also a possible operation. Any good faith operations on the existing Henderson wells being conducted in February 2008 would have extended the lease pursuant to paragraph (6) until those operations ended unsuccessfully and for 90 days thereafter. If such operations *294 proved successful in establishing commercial production, the lease in its entirety arguably could have been extended for two years before any division of the lease by the Pugh clause.
In reading these contractual provisions together, we find that the habendum clause, paragraph (6) and the Pugh clause are interrelated and authorize an extension of the lease after February 28, 2008, by Mecom’s operations. Henderson had consented to this framework when he signed the lease in 2005 before ever meeting Me-com. A party who signs a written instrument is presumed to know its contents and cannot avoid its obligations by contending that he did not read it, that he did not understand it or that the other party failed to explain it to him. If a party can read, it behooves him to examine an instrument before signing. Peironnet v. Matador Resources Co., 2012-2292 (La.6/28/13), - So.3d-, 2013 WL 3752474; Aguillard v. Auction Management Corp., 2004-2804, 2004-2857 (La.6/29/05), 908 So.2d 1.
| inHere, the plaintiffs’ basic contention is that the defendants deceived Henderson about the meaning of the terms of his own lease despite the fact that he had performed as lessor under the lease for almost three years. As lessor, Henderson knew or should have known the meaning of the provisions in his 2005 lease, which contained the continuous operations and Pugh clauses. The record does not show that Henderson was unable to read and he should not be able to deny knowledge of the terms of the 2005 lease by willful ignorance.
Regarding the February 2008 extension, Henderson was not pressured to immediately sign the lease amendment. Plaintiffs assert that Henderson did not agree to the amendment provision giving the lessee an option to extend the lease term for two years beyond February 2010. Contrary to the plaintiffs’ assertion, the two-year option is expressly stated in the lease amendment and Henderson is presumed to know the contents of the instrument that he signed. Additionally, we note that the lease was fully developed by the wells drilled into the Haynesville Shale on the Henderson tract before February 2010.
Moreover, in return for agreeing to the extension, Henderson received an additional bonus, an increased royalty and removal of the words “Two (2) years” from the Pugh clause. Although the bonus amount for the extension was slightly less than the bonus for the original lease, the extension amount was for a two-year period, while the original bonus was for a three-year primary term. The deletion of the words from the Pugh clause benefitted Henderson by removing the time delay for triggering the 12neffects of the Pugh clause. The royalty increase to 20% is reflected in the lease amendment, which was not recorded. The plaintiffs complain that the increased royalty was not mentioned in the recorded memorandum of the lease extension. However, we note that the memorandum of the extension complies with the requirements of LSA-R.S. 9:2742 and does not indicate an attempt to deny plaintiffs their royalty increase.
After reviewing the entire record and the applicable law, we conclude the trial court was clearly wrong in finding that defendants misrepresented the Pugh clause in asserting their rights as lessees under the 2005 lease in their discussions with Henderson regarding the amendment to extend the primary term of the lease. Consequently, the plaintiffs failed to satisfy their burden of proving fraud by defendants in obtaining Henderson’s consent to the lease extension.
In making the determination that there was no misrepresentation by defendants, *295 we need not discuss the issues of whether there was a relation of confidence between the parties or whether defendants were aware of the economic viability of developing the Haynesville Shale in February 2008. Even if we were to consider these matters, the record does not support the trial court’s findings on these issues. Relation of Confidence
The trial court found that there was a relation of confidence between the parties. The court acknowledged that but for this relationship, the Hendersons would not have been able to prove their fraud claim as they |⅞1 could have easily obtained the truth of the matter without difficulty or special skill.
A cause of action for fraud under LSA-C.C. art.1954 concerns a breach of a relationship of confidence between a trusted party (“trustee”) and his confidant who gives consent to a contract in reliance upon the trustee. This action consists of: (1) the trustee/confidant relationship; (2) the confidant’s reasonable reliance upon the trustee despite the fact that the confidant “could have ascertained the truth” of the flaw in the contract “without difficulty, inconvenience, or special skill;” (3) assertions or representations by the trustee made with the intention to obtain an unjust advantage for the trustee; and (4) the confidant’s later discovery that his consent to the contract was induced by the trustee’s misrepresentation or his suppression of material facts. Sanders Family, LLC No. 1 v. Sanders, 46,476 (La.App.2d Cir.12/14/11), 82 So.3d 434, zvrit denied, 2012-0414 (La.4/9/12), 85 So.3d 702.
A cause of action based on a relation of confidence was found to exist in Sanders. In that ease, a 76-year-old mother, who was the managing partner of an LLC that she owned with her three children, was induced to sell LLC property at well below its market value to her son and his wife, who later resold the property for great profits. She relied on her son to run the LLC on a daily basis, for which he was paid, and to give her advice about matters related to the LLC. She also regularly signed documents without reading them if she trusted the person advising her. In one particularly egregious transaction detailed in Sanders, the son told his 122mother that a sale was in the best interest of the LLC without disclosing that the buyer was a company owned by him. He also falsely told the mother that the property was burdened by a large mortgage because he knew that she did not like debt.
The Third Circuit has stated that its own synthesis of the jurisprudence reveals that a relation of confidence has been found to exist where there is a longstanding and close relationship between the parties due to numerous transactions, but the confidant/trustee relationship is less likely to exist between parties to a single or limited business transaction. Sepulvado v. Procell, 2012-271 (La.App.3rd Cir. 10/3/12), 99 So.3d 1129.
In Hickman v. Bates, 39,178 (La.App.2d Cir.12/15/04), 889 So.2d 1249, this court found a relation of confidence where a young woman with limited education and ability to understand financial transactions relied on her relatives to advise her. Further, in Skannal v. Bamburg, 44,820 (La. App.2d Cir.1/27/10), 33 So.3d 227, unit denied, 2010-0707 (La.5/28/10), 36 So.3d 254, a relation of confidence was found between longstanding partners who had worked together over 25 years in numerous business ventures.
In support of its finding of a relation of confidence, the trial court cited Perot v. Perot, 46,431 (La.App.2d Cir.8/10/11), 71 So.3d 1123, unit denied, 2011-2263 (La.11/23/11), 76 So.3d 435. In that case, a wife successfully argued that her consent *296 to a community property agreement was vitiated by fraud. The attorney who prepared the agreement was a close family friend. Not only was the wife unaware that her husband had filed for l^divorce that day, she was not told that the attorney was representing her husband.
Here, despite the testimony that Henderson had considered Gaylord and Mecom to be his close friends, the cited cases demonstrate that a relation of confidence arises when there is a family relationship involved, such as in Sanders (elderly mother and son) and Perot (spouses married for 20 years), or there has been a long-term business relationship, as in Skannal (partners had worked together over a 25-year period). There is no such enduring family, marital or fiduciary relationship involved in this case. As addressed above, a party with advantages under an existing onerous contract is not precluded from asserting those advantages in his dealings with the other party to the contract, regardless of their friendship.
Henderson first met Gaylord in 2005, so that their intermittent social and business interactions were limited to a period of three years. Henderson did not meet Me-com until 2007 and he was not involved in the original lease. Thus, the record does not support a finding that a relation of confidence existed that would excuse Henderson from being held responsible for knowing the written provisions of the 2005 lease.

Haynesville Shale

Based upon circumstantial evidence, the trial court ruling indicates the presence of an “ulterior motive” on the part of Mecom to acquire the two-year extension of the lease for only $90 per acre, with knowledge of the enormous economic potential of the Haynesville Shale. The ruling suggests, without specifically finding, that Mecom knew the existence of l^the Haynesville Shale made Henderson’s acreage worth upwards of 75 times more than the $90/acre bonus Henderson actually received, as indicated by the price Pe-trohawk later paid for the acreage.
At trial, Mecom testified that in early February 2008, he did not know that the value of the Henderson acreage would soon be exorbitantly transformed by the results of Haynesville Shale tests in area wells. There was no evidence that the Mecom Group and Gaylord were taking other actions at the time to suggest such knowledge, such as by acquiring unleased acreage in Bossier, Caddo or Red River Parishes. Henderson therefore had the burden of proving through circumstantial evidence that Mecom and his companies, as independent operators in the oil industry, must have known of the dramatic shift in mineral values in the local area.
In an attempt to prove such knowledge, the plaintiffs presented the expert testimony of Robert McGowen, a consulting reservoir engineer. McGowen presented a timeline of Haynesville Shale activity in North Louisiana from well information available from the Louisiana Department of Conservation and other sources through February 2008. McGowen’s report indicated that four wells involving the Haynes-ville Shale had reports of production before February 2008, but only one of those was drilled as a horizontal test. EnCana Oil & Gas, Inc., drilled two vertical wells in the Bracky Branch field in Red River Parish. The EnCana wells were permitted as Smackover tests and listed as completed in units for the Jurassic Sand formation with relatively small production rates reported upon completion of the wells. McGowen confirmed, however, that the wells were actually | ¡^producing from the Haynesville Shale. McGowen explained that different permitted horizons were used because the companies drilling the wells did not want *297 anyone to know to what formation they were drilling. Of two wells drilled by Chesapeake Operating, Inc., in the Johnson Branch Field in Caddo Parish, one was completed horizontally in the Haynesville Shale in October 2007. The EnCana and Chesapeake wells were located 20 to 25 miles away from the Henderson property in other parishes.
McGowen testified that in his research he did not attempt to compile leasing data for the per acre value of unleased properties. Nevertheless, his written analysis included a June 2008 report by Tristone Capital Company, which made the following assessment of the abrupt market change in state lease bonus payments:
While it is difficult to ascertain and verify specifically what operators are paying for leases to private landowners, State of Louisiana lease sale data shows that the lease bonus/acre has escalated rapidly from $100-200/acre in January to in excess of $17,000/acre in June.
McGowen confirmed that lease bonus payments spiked in April 2008, after the initial public announcements of the Haynesville Shale potential by Chesapeake and Petro-hawk in March 2008. McGowen concluded that in February 2008, Chesapeake, EnCa-na, and Petrohawk would have had knowledge of the Haynesville Shale because of their acreage positions. McGowen also opined that any large working interest in the area at that time would have had “some knowledge” of the Haynesville Shale.
From our review of McGowen’s testimony, we find that there was information available from one horizontal well involving the Haynesville |MShale before February 2008. Such evidence is insufficient to demonstrate that defendants were aware at the time of the enormous commercial potential for the Haynesville Shale over such a large expanse of acreage from Cad-do Parish through south Bossier Parish to Red River Parish. The market value of unleased acreage as reflected in lease bonus payments was not shown to have changed in early February 2008. This indicates that at that time, other than the three companies identified by McGowen, the industry participants and professionals did not yet understand the great commercial potential of the Haynesville Shale.
Based on this record, the evidence presented fails to show that the Mecom Group, other leasehold owners in North Louisiana, or the oil and gas industry in general, more probably than not understood in February 2008 that unleased acreage was soon to be worth thousands of dollars per acre. Thus, the trial court was clearly wrong in finding that the defendants misled Henderson about their actual reason for seeking to extend the primary term of the lease.
As stated above, we conclude that the defendants made no misrepresentation of their lease rights in obtaining the lease amendment. In reaching this conclusion, we pretermit discussion of the assignments of error concerning the denial of the exceptions of nonjoinder and the petition for intervention.
CONCLUSION
For the foregoing reasons, the trial court’s judgment rescinding the 2008 lease amendment and declaring that the 2005 lease has expired is |a7reversed. We vacate the trial court’s order that the defendants pay $16,152.50 in expert witness fees and vacate the order that the defendants pay to plaintiffs the amount of $1,612,880 in attorney fees. Costs in the district court and on appeal are assessed to the appellees, Harry and Sherry Henderson.
REVERSED.
DREW, J., dissents and assigns reasons.

. A Pugh clause is included in a mineral lease to limit the principle of LSA-R.S. 31:114 that operations on a portion of the lease premises will maintain the lease as to the entirety of the land burdened by the lease. Comment, Article 114 of the Louisiana Mineral Code.

. The record indicates that at least one of the Henderson wells was drilled outside of the was permitted and spudded in August 2007. This well was drilled in the north edge of Section 33. The well never produced, but was not plugged and abandoned. These wells were drilled to test the Cotton Valley and Hosston formations and were operated by Windrush Operating Company/Mecom.[2] units for the Cotton Valley formation.

. Petrohawk appeals under LSA-C.C.P. art. 2086, which provides that a person who could have intervened in the district court may appeal the judgment.