Judgment rendered August 14, 2019.
Application for rehearing may be filed
within the delay allowed by Art. 2166,
La. C.C.P.

No. 52,745-CA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

PORT CITY VENTURES, L.L.C.                    Plaintiff-Appellee

versus

DONALD G. ANGLE,                              Defendants-Appellants
MATTHEW G. ANGLE,
BRIANA STANLEY, AND
PORT CITY ARMORY, L.L.C.

* * * * *

Appealed from the
First Judicial District Court for the
Parish of Caddo, Louisiana
Trial Court No. 583,362

Honorable Ramon Lafitte, Judge

* * * * *

SINCLAIR LAW FIRM, LLC                        Counsel for Appellants
By: Scott C. Sinclair

AYRES, SHELTON, WILLIAMS,                     Counsel for Appellee,
BENSON & PAINE, LLC                           Port City Ventures, LLC,
By: Curtis Ray Shelton                        and Third Party Appellee,
    Lee H. Ayres                              Richard D. Lamb, II
    Ryan P. Telep

* * * * *

Before WILLIAMS, STONE, and STEPHENS, JJ.

**STEPHENS, J.**

Defendants, Donald G. Angle, Matthew G. Angle, and Port City Armory, L.L.C., appeal a judgment of the First Judicial District Court, Parish of Caddo, State of Louisiana, in favor of Plaintiff, Port City Ventures, L.L.C. For the following reasons, we affirm in part and reverse in part the trial court's judgment.

## FACTS AND PROCEDURAL HISTORY

In late 2012 and early 2013, there was a period of excessive demand (commonly known as a "market run") for AR-15 rifles and magazines.[1] Amidst this market run, Matt Angle and Josiah Rosmarin, doctoral candidates at the Massachusetts Institute of Technology, designed a plastic magazine for an AR-15 that would hold 30 rounds of ammunition, which they called the FS30. Matt then consulted his father, Don Angle, regarding the prospect of starting a business to manufacture and sell the magazines. Following Don's research into the logistics of marketing, production, and distribution, Port City Armory, L.L.C. ("Armory"), was formed by Matt, Don, and Josiah's wife, Briana Stanley, for the purpose of manufacturing and selling the magazines.[2]

Subsequently, Don contacted Walter Frederick, president of Sports South, L.L.C. ("Sports South"), a Shreveport company engaged in the distribution of firearms and related products, and on February 19, 2013, Sports South issued six purchase orders to Armory for the purchase of 50,000 magazines per month for a six-month period at a price of $11.00 per

---

[1] This market run manifested in anticipation of new gun legislation following the mass shooting at Sandy Hook Elementary School in Newtown, Connecticut, on December 14, 2012.

[2] Brianna Stanley was dismissed as a defendant prior to trial.

magazine. The purchase orders provided shipping dates on the first day of six consecutive months in 2013—starting in April. On each purchase order appeared the language: "SHIP NO BACK ORDERS WITHOUT PERMISSION UNLESS PREPAID."

Thereafter, Don met with Walter Lamb of Ouachita Independent Bank and attempted to obtain financing for Armory but was informed he could not obtain a loan based on the purchase orders. Don was later able to finance the startup costs for Armory by obtaining a line of credit for $150,000 through Versa Finance, which line of credit was secured by immovable property owned by Don and the personal guaranties of each of Armory's members. Meanwhile, Walter Lamb advised his brother, Richard Lamb, II, that he should contact Don regarding the business opportunity he was pursuing.

Richard, a medical sales representative who makes private investments on the side, subsequently contacted Don and expressed his interest in investing in Armory. The two first met to discuss the venture in either April or May 2013, at which time Don informed Richard of the Sports South purchase orders. Ultimately, to facilitate their discussion, they signed a Confidentiality Agreement dated May 30, 2013. On June 2, Don, Matt, and Josiah met with Richard at his home to further discuss Richard's interest in investing in Armory. On June 10, Lamb Capital, L.L.C., a company consisting of Richard and his children, issued Armory a Letter of Intent to acquire 10% of the capital interest in Armory. The Letter of Intent was drafted by Richard's son, Rich, who is an attorney, and provided in part that "the purchase price or capital contribution shall be ten percent (10%) of: the total value of the purchase order by and between Port City Armory, L.L.C.

2

and Sports South, L.L.C., less the expenses and costs associated with said purchase order."

Don attached a signed copy of the Letter of Intent to an email sent to Rich on June 13, and Richard, Matt, and Josiah were copied on the email as well. The email by Don provided in part:

> Due to the fact that the P.O.'s from Sports South represent a monthly buying level and not really a one time purchase, and the fact that the buying level is subject to change based on Sport South's ability to move our magazines, I'd rather not base this agreement on the expected profit on the written P.O.'s in hand. I do have 6 P.O.'s for the purchase of 50,000 magazines [for] each of the next 6 months but I expect the quantities will change over that time frame. At the time I received these P.O.'s my customer said he would buy at least 50,000 a month based on the current demand. Today it appears that the quantity will be less than 50,000 a month but as soon as Gun Control gets back in the headlines every day, the quantities may increase substantially.

On June 21, Richard formed Port City Ventures, L.L.C. ("Ventures"), with Jim Haynes and J&S Hardin Holdings, L.P. (whose manager is John Hardin, III). It was ultimately Ventures, rather than Lamb Capital, that on June 24 entered into an agreement with Armory, paying Armory $250,000 in exchange for a 10% equity interest in Armory. An amended Operating Agreement reflecting the purchase and status of Ventures as a member of Armory was signed by Don and Richard. The next day, Armory repaid in full its loan from Versa Finance.

On June 27, Richard and Don met with Sports South, at which time Walter Frederick advised the market conditions had deteriorated rapidly and Sports South would, therefore, only be able to make a one-time purchase of 10,000 magazines. That purchase was made on June 30, 2013, for which Sport South issued a $110,000 payment to Armory. Tension grew between

3

Armory and Ventures regarding the uncertainty of Armory's financial success and Ventures' desire to have its investment returned.

On March 13, 2015, Ventures filed the instant petition for reimbursement of the funds it invested due to Armory's misrepresentations and fraudulent inducement of Ventures' investment. Specifically, Ventures claimed Armory knew and failed to disclose to Ventures that the Sports South purchase orders were invalid, unenforceable, and speculative. Armory filed a reconventional demand and third party demand against Ventures and Richard, individually, claiming they had breached the Letter of Intent by failing to provide adequate marketing and sales assistance, and had likewise breached the Confidentiality Agreement by bringing their lawsuit.

Following a bench trial, the trial court issued an oral ruling on May 10, 2018, in favor of Ventures, stating it found Armory suppressed the truth with the intent of obtaining an unjust advantage over Ventures and Ventures had not breached either the Confidentiality Agreement or Letter of Intent. In support of its finding, the trial court specifically noted the following:

> At no time prior to the June 25th, 2013 date of the sell [sic] of the ten percent interest did the defendants inform plaintiff that the ship dates on three of these purchase orders had passed and that no back orders were permitted without permission. Additionally, Don Angle stated in an email dated February 13, 2013, that Walter Fredrick of Sports South was not interested in financing Port City Armory but was happy to issue it a large purchase order that Don Angle could take to the bank to borrow against if Armory needed it.

Judgment was filed August 17, 2018, against Don, Matt, and Armory, *in solido*, in the amount of $250,000 together with $100,000 for attorney fees and expenses. The trial court's judgment also dismissed Armory's reconventional and third party demands. This appeal by Armory ensued, and Ventures answered to request additional attorney fees.

4

## DISCUSSION

## Fraud

On appeal, Armory asserts in three assignments of error that the trial court's finding of fraud by silence or suppression was precluded because: (1) Armory did not have a special duty to speak; (2) Ventures did not avail itself of readily available means of knowledge; and, (3) the undisclosed information did not substantially influence Ventures' decision to purchase an interest in Armory.

### *Legal Principles*

A contract is formed by the consent of the parties established through offer and acceptance. La. C.C. art. 1927. Contracts have the effect of law for the parties and must be performed in good faith. La. C.C. art. 1983. Consent to a contract may be vitiated by fraud. La. C.C. art. 1948.

Fraud is a misrepresentation or a suppression of the truth made with the intention either to obtain an unjust advantage for one party or to cause a loss or inconvenience to the other. Fraud may also result from silence or inaction. La. C.C. art. 1953. Fraud need only be proved by a preponderance of the evidence and may be established by circumstantial evidence. La. C.C. art. 1957; *Benton v. Clay*, 48,245 (La. App. 2 Cir. 8/7/13), 123 So. 3d 212. The basic elements to an action for fraud against a party to a contract are: (1) a misrepresentation, suppression, or omission of true information; (2) the intent to obtain an unjust advantage or to cause damage or inconvenience to another; and (3) the error induced by a fraudulent act must relate to a circumstance substantially influencing the victim's consent to (a cause of) the contract. *Shelton v. Standard/700 Associates,* 2001-0587 (La. 10/16/01), 798 So. 2d 60; *Henderson v. Windrush Operating Co.,* 47,659 (La. App. 2

5

Cir. 8/21/13), 128 So. 3d 283, 291, *writ denied*, 2013-2502 (La. 2/14/14), 132 So. 3d 411.  Additionally, to find fraud from silence or suppression of the truth, there must exist a duty to speak or to disclose information.  *Greene v. Gulf Coast Bank*, 593 So. 2d 630 (La. 1992); *Skannal v. Bamburg,* 44,820 (La. App. 2 Cir. 1/27/10), 33 So. 3d 227, *writ denied,* 2010-0707 (La. 5/28/10), 36 So. 3d 254.  Fraud does not vitiate consent when the party against whom the fraud was directed could have ascertained the truth without difficulty, inconvenience, or special skill.  However, this exception is not applicable when a relation of confidence has reasonably induced a party to rely on the other's assertions or representations.  La. C.C. art. 1954.

The trial court's findings with respect to a claim of fraud are subject to the manifest error standard of review.  *Clay v. Washington*, 51,065 (La. App. 2 Cir. 1/11/17), 211 So. 3d 1266.  To reverse a fact finder's determination, the appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court and that the record establishes that the finding is clearly wrong.  *Stobart v. State Dept. of Transp. & Dev.*, 617 So. 2d 880 (La. 1993); *Henderson*, *supra.*

*Analysis*

In its first assignment of error, Armory asserts the trial court erred by finding fraud by silence or suppression in the absence of a special duty to speak.  Armory argues there was no evidence any special relationship existed between Armory and Ventures prior to the June 24 closing.  We agree.

Jurisprudence demonstrates a relation of confidence arises when there is a family relationship involved and where there is a longstanding and close relationship between the parties due to numerous transactions, but the

6

confidant/trustee relationship is less likely to exist between parties to a single or limited business transaction. *Henderson*, *supra*.

A cause of action for fraud based on a relation of confidence was found to exist in *Sanders Family, LLC No. 1 v. Sanders,* 46,476 (La. App. 2 Cir. 12/14/11), 82 So. 3d 434, *writ denied,* 2012-0414 (La. 4/9/12), 85 So. 3d 702, where a 76-year-old mother, who was the managing partner of an L.L.C. that she owned with her three children, was induced to sell L.L.C. property at well below its market value to her son and his wife, who later resold the property for great profits. She relied on her son to run the L.L.C. on a daily basis, for which he was paid, and to give her advice about matters related to the L.L.C. She also regularly signed documents without reading them if she trusted the person advising her. Similarly, in *Hickman v. Bates,* 39,178 (La. App. 2 Cir. 12/15/04), 889 So. 2d 1249, this court found a relation of confidence where a young woman with limited education and ability to understand financial transactions relied on her relatives to advise her.

A relation of confidence was also found to exist in *Perot v. Perot,* 46,431 (La. App. 2 Cir. 8/10/11), 71 So. 3d 1123, *writ denied,* 2011-2263 (La. 11/23/11), 76 So. 3d 435. In that case, a wife successfully argued her consent to a community property agreement was vitiated by fraud where the attorney who prepared the agreement was a close family friend. Not only was the wife unaware her husband had filed for divorce that day, she was not told the attorney was representing her husband.

In *Skannal*, *supra*, a relation of confidence was found between longstanding partners who had worked together over 25 years in numerous business ventures and had a close personal working relationship. Upon

7

consideration of the above cited cases, this court in *Henderson*, *supra*, found that no relation of confidence and resulting duty to speak existed between parties to a lease who during a three-year period had developed a close relationship that consisted of regular visits and phone conversations, discussions of family and unrelated business endeavors, and time spent together that included their families.

Here, Ventures has not shown Armory had a duty to disclose the withheld information prior to the closing. First, there is clearly no enduring family or marital relationship that would give rise to a duty to disclose. Additionally, there is no long-term business relationship that would create such duty. All three members of Ventures testified that in determining to invest in Armory, they relied solely on the information provided by Don and that they trusted Don. However, the record is void of any real justification for Ventures' reliance on Don. Jim Haynes testified he knew Don from high school but that prior to this transaction, they had not had any notable interaction since then. Likewise, Richard testified that he knew of Don simply because, like himself, he was an alumnus of Texas A&M University. While the testimony shows the members of Ventures were friends and had made various investments together in the past, it is undisputed that this transaction was the very first between Ventures (or any of its members) and Armory (or any of its members), and the record clearly shows that absolutely no relationship of any kind existed between them previously. Moreover, the closing occurred merely two months after the time Don first contacted Richard. Prior to closing, the totality of the interaction between Ventures and Armory consisted of a handful of meetings, and two months' worth of emails and text messages. The parties' use of the Confidentiality Agreement

8

and Letter of Intent further demonstrates the absence of a relation of confidence. Based on these facts and the cited jurisprudence, the brief business relationship between Ventures and Armory is simply not sufficient to create a relation of confidence and duty to speak.

Furthermore, a fiduciary relationship did not exist between the parties. As manager of a limited liability company, Don undeniably stood in a fiduciary relationship with that limited liability company and its members. La. R.S. 12:1314. However, each of the alleged nondisclosures claimed by Ventures occurred before the closing and before Ventures became a member of Port City Armory, L.L.C. The trial court did not articulate in its oral reasons a specific finding regarding Armory's duty to speak. However, after reviewing the record in its entirety as well as the applicable law, we find there is no reasonable factual basis to support the trial court's finding that a duty to speak or relation of confidence existed in this case. We therefore conclude the trial court was clearly wrong in holding Armory committed fraud by silence or suppression against Ventures.

With this determination, we need not discuss Armory's remaining two assignments of error regarding the trial court's finding of fraud. Nonetheless, we note that if affirmative misrepresentations rather than nondisclosures regarding the purchase orders were the issue (thereby eliminating the additional duty to speak element required for fraud by silence), the trial court's finding of fraud would still be clearly wrong because the record is void of a reasonable factual basis to support the finding that Ventures could not have ascertained the truth about the purchase orders without difficulty, inconvenience, or special skill.

The Letter of Intent provides in pertinent part:

> In connection with negotiations relating to the possible acquisition by the investors, Investors shall have the right, at Investor's expense, to examine and copy all books, records, files, documents, reports, and other information of the Company, including all leases, service agreements, insurance policies, and intellectual property related documents.

Accordingly, Richard and his affiliates had a right to examine the purchase orders. By doing so, they could have easily ascertained two of the three nondisclosures cited by the trial court—the shipping dates on three of the purchase orders had passed at the time of closing and the purchase orders included the language "Ship no back orders without permission unless prepaid." However, Don and each of the three members of Ventures testified that neither Richard nor any other member of Ventures ever requested to see the purchase orders prior to closing.

Likewise, all three members of Ventures testified they did not reach out to Sports South to confirm the validity of the purchase orders. They each testified they thought it would have been inappropriate to go behind Don's back and contact Sports South. There is no indication in the record Don was ever asked about setting up a conversation between Ventures and Sports South; nor does the record show any evidence that Ventures would have encountered any difficulty in contacting Sports South or that such efforts would have required any special skill. Finally, considering Ventures' argument that it relied solely on the purchase orders in deciding to invest in Armory, any slight inconvenience making a single phone call to Sports South would have caused, would certainly have been inconsequential

compared to the information regarding the purchase orders that would have been obtained as a result. [3]

Therefore, based on a thorough review of the record, we find Ventures' consent to its purchase of a 10% interest in Armory could not have possibly been vitiated by fraud. Ventures relied solely on information provided by Armory and refused to confirm or even request to see the purchase orders on which it was basing its $250,000 investment. There was no relation of confidence that could have reasonably induced Ventures to rely on Armory's assertions made through arm's-length negotiations between experienced and sophisticated business persons. The trial court erred on the issue of fraud.

## Armory's Reconventional and Third Party Demand

### Breach of Contract

In its fourth assignment of error, Armory asserts the trial court erred by failing to render judgment in its favor regarding its breach of contract claim against Ventures and Richard. Armory argues Richard and Ventures breached their agreement with Armory to provide marketing and sales assistance to the company. We disagree.

The Letter of Intent provides in pertinent part:

The investors have full-time jobs that take priority over their potential obligations to the Company. However, it is expected that the investors that participate in sales on behalf of the

---

[3] Ventures additionally asserts Armory is liable to them under La. R.S. 51:712(A), which provides in pertinent part: "It shall be unlawful for any person . . . (2) To offer to sell or to sell a security by means of any oral or written untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, the buyer not knowing of the untruth or omission, if such person in the exercise of reasonable care could not have known of the untruth or omission." However, Ventures' failure to exercise reasonable care would likewise preclude recovery under this statute, to the extent it is applicable.

11

> Company shall make a good faith and reasonable effort to
> market and sell the products of the Company.

Armory points particularly to Richard's failure to secure sales made through his industry contact, Mike Murski. The trial court noted in its oral ruling that although Richard threatened to terminate his relationship with Murski in an October 2013 email, the court did not find any evidence such termination occurred or that Richard had discontinued his efforts to market the FS30. After review of the record in its entirety, we cannot say this factual determination by the trial court was manifestly erroneous or clearly wrong. Richard and Don both testified that even after the market run ended, Murski was confident he could still sell approximately 100,000 units in the next year. They also testified that no magazine sales through Murski were ever made. However, the record reflects Richard continued to market the FS30 after the June 27 meeting with Sports South and even still after his October 2013 email to Don. Specifically, Richard maintained contact with Murski and coordinated with Don to have sample FS30s shipped to Murski and other potential purchasers. While Richard's efforts never materialized into additional sales, we cannot say that, considering the steadily deteriorating relationship between the parties, the trial court erred in determining Richard made a sufficient good faith effort to market the FS30. This assignment of error is without merit.

### *Confidentiality Agreement*

In its fifth assignment of error, Armory asserts the trial court erred by failing to render judgment in its favor on its claim under the Confidentiality Agreement. Armory claims Ventures' lawsuit violates Paragraph F of the Confidentiality Agreement, which states in pertinent part:

> Except as provided in this provision, Seller makes no representation or warranty regarding the accuracy or completeness of the Confidential Information. Recipient agrees that Seller shall have no liability to Recipient resulting from Recipient's use of Confidential Information, except as may be expressly set forth in a definitive written agreement between the parties and in accordance with the terms thereof.

Armory argues the purchase orders are the kind of information covered by Paragraph F. Armory maintains that by filing this lawsuit, Ventures and Richard violated the understanding that Armory made no representation or warranty regarding the accuracy or completeness of the purchase orders and would have no liability resulting from Richard and Ventures' use of the purchase orders in consideration of whether or not to enter into a transaction with Armory. We disagree.

As basis for denying this claim by Armory, the trial court cited only its finding that Armory had committed fraud. While we disagree with the trial court's reasons, we find from thorough review of the record that a reasonable factual basis does exist for the trial court's denial of Armory's claim under the Confidentiality Agreement. Significantly, Ventures' petition did not simply seek to recover damages it incidentally incurred as a result of its use of incomplete or inaccurate "Confidential Information." Instead, Ventures sought to hold Armory liable for fraud—intentional misrepresentations and suppression of the truth for the purpose of gaining an unjust advantage. Despite Ventures' failure to ultimately prevail in its action for fraud against Armory, its pursuit of that action was not prohibited by the Confidentiality Agreement. This assignment of error is without merit.

## CONCLUSION

For the reasons stated above, we reverse that portion of the trial court's judgment awarding $250,000 and attorney fees to Port City

13

Ventures, L.L.C. Accordingly, we deny Port City Ventures, L.L.C.'s request for additional attorney fees in its answer to appeal. We affirm that portion of the trial court's judgment denying the claims made in Port City Armory, L.L.C.'s, reconventional and third party demands. Costs in this court are assessed one-half to Port City Ventures, L.L.C., and one-half to Port City Armory, L.L.C., Donald G. Angle, and Matthew G. Angle.

**REVERSED IN PART, AFFIRMED IN PART.**